UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DENNIS BALK,

                    Plaintiff,

             - against -

NEW YORK INSTITUTE OF TECHNOLOGY
and INFOTEC CORPORATION,

                  Defendants.

-------------------------------------------------------------X

**ECF CASE**

**COMPLAINT**

**JURY TRIAL DEMANDED**

*SUMMONS ISSUED*

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ FEB 01 2011 ★

2/4/11  ELR

BROOKLYN OFFICE

CV 11 - 0509

BIANCO, J.

TOMLINSON, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ FEB 01 2011 ★

BROOKLYN OFFICE

       Plaintiff DENNIS BALK ("Plaintiff"), by his attorneys KORNFELD & ASSOCIATES, P.C., complaining of defendants NEW YORK INSITUTE OF TECHNOLOGY ("NYIT") and INFOTEC CORPORATION ("Infotec") (collectively, "defendants"), alleges as follows:

### NATURE OF ACTION

       1.    Plaintiff, an American citizen, brings this action to remedy discrimination on the basis of his race, creed and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff also brings this action against Infotec to remedy unlawful interference with Plaintiff's contractual rights.

       2.    NYIT hired Plaintiff to be the Director of the Computer Graphics Department at NYIT Bahrain pursuant to a written agreement (the "Teaching Agreement"). In conjunction therewith, NYIT promoted Plaintiff on the basis of his reputation as ushering in a new age and quality in the Computer Graphics Department. Plaintiff traveled to Bahrain to begin his teaching duties in or about June 2006.



3.     NYIT is in the business of making money in Bahrain.  As part of its goal to make money, NYIT essentially franchises its name to various local educational sites in the Middle East, including Bahrain, Jordan and the United Arab Emirates.  As part of its goal to make money, NYIT used defendant Infotec to solicit Bahraini Muslims to operate the NYIT facility in Bahrain.  NYIT routinely recruits high-quality, white, non-Muslim college professors from Western universities to teach, in English, at the Bahrain facility.

4.     Without actual disclosure to prospective teaching applicants or NYIT Bahrain faculty recruited from Western universities and Western locations, NYIT practices an illegal discriminatory policy toward any complaint against the Western, non-Muslim faculty by Muslim students or Muslim faculty.  This illegal discriminatory policy constitutes impermissible and illegal discrimination which violates all established academic protocols for dealing with complaints against faculty by students.  NYIT and Infotec practice a policy of showing Muslim parents and students that any claimed deviation from Muslim culture will not be tolerated and, in fact, NYIT and Infotec have routinely misrepresented the conduct of Western faculty and have illegally discriminated against Western faculty as part of NYIT's illegal discriminatory practices against Western, non-Muslim faculty when any controversy has arisen concerning the conduct of Western, non-Muslim faculty. NYIT and Infotec routinely effect illegal discriminatory acts when a Western, non-Muslim faculty member is falsely accused of violating any norms, mores or values not acceptable to its Muslim clientele by discrediting and terminating the Western faculty member and forcing the Western faculty member to leave the country for fear of personal safety.

5.     This illegal discriminatory practice was an undisclosed, impermissible condition of Plaintiff's employment in Bahrain.  When Plaintiff was falsely accused of explaining Western values in a manner purportedly offensive to Muslim students, NYIT and Infotec illegally

discriminated against Plaintiff by terminating Plaintiff, who always provided exemplary services in Bahrain, without having any legitimate reason to do so, after Infotec actively caused articles to be published in local Bahraini newspapers falsely accusing Plaintiff of having posted the highly controversial Danish cartoon insulting the Prophet Mohamed on his website.  NYIT and Infotec engaged in this illegal discriminatory conduct solely based on the fact that Plaintiff's accusers were Muslim and Plaintiff was a Western, non-Muslim and a citizen of the United States.

6. The illegal discriminatory decision to discredit and terminate Plaintiff, and make false representations concerning the Plaintiff in the local Bahraini newspapers, was made by NYIT and Infotec personnel.  In terminating Plaintiff, defendants flouted the anti-discrimination laws to a degree rarely seen in a contemporary work place.

7. This proceeding is brought to remedy discrimination on the basis of race, creed and national origin in the terms and conditions of employment in violation of 42 U.S.C. 2000e *et seq*.  Plaintiff seeks compensatory and punitive damages, attorney's fees, and other appropriate legal and equitable relief pursuant to Title VII and the common law of New York State.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's Title VII claims against defendant NYIT under 28 U.S.C § 1331 and §§ 1343(a)(3) and (4).  This Court has supplemental jurisdiction over Plaintiff's common law claim against defendant Infotec pursuant to 28 USC § 1367 because these claims closely relate to the Title VII claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

9. Jurisdiction and venue in this Court are proper under 42 U.S.C. § 2000e-5(f)(3) because, upon information and belief, the employment records relative to the unlawful employment practice complained of herein are maintained and administered in the Eastern

District of New York, and venue is also proper in this district pursuant under 28 U.S.C. § 1391 because defendant NYIT is a resident of the Eastern District of New York and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Eastern District of New York. Venue in this district as to defendant Infotec is proper because a substantial part of the acts or omissions giving rise to the cause of action against defendant Infotec occurred in this district pursuant to 28 U.S.C. § 1391.

10.     Jurisdiction and venue in this Court are proper as to defendant Infotec under New York CPLR §§ 301 and 302(a)(1) as defendant Infotec regularly transacts business in New York. Pursuant to a written agreement between NYIT and Infotec (the "Infotec Agreement") (annexed hereto as Exhibit "1"): (1) Infotec has an ongoing business relationship with NYIT (Exhibit 1, generally); (2) the Infotec Agreement was negotiated, at least in part, at NYIT's location in Old Westbury, New York; (3) the Infotec Agreement is governed by and construed in accordance with the laws of the State of New York, and each party agrees to submit any disputes thereunder to the exclusive jurisdiction and venue of a court of competent jurisdiction located in Nassau County or New York County, State of New York, and to submit to the in personam jurisdiction of such court (Exhibit "1" at ¶ 36); and (4) NYIT "review[s] and approve[s]... the contents of all advertising, promotional and recruitment materials, the NYIT name and logo and any representation of its programs produced and distributed by Infotec," (Exhibit "1" at ¶ 3), "NYIT reserves the right... to establish admission, program and degree requirements, curriculum and course content, grading standards and all other matters pertaining to academic standards and policies, including all policies and decisions relating to students, faculty and academic administrators," (Exhibit "1" at ¶ 8), "Infotec agrees that it will perform all services hereunder in accordance with all applicable US law and the reasonable directions of NYIT," (Exhibit "1" at ¶

37).  Furthermore, pursuant to the Infotec Agreement, "...Infotec will deposit 25% of NYIT's share of the revenue, in U.S. dollars, into a local NYIT bank account," (Exhibit "1" at ¶ 14) and, "[t]he resulting amount, in U.S. dollars, will then be deposited by Infotec into a local NYIT bank account..." (Exhibit "1" at ¶ 16).

11.     As set forth above, Infotec transacts business in New York because: (1) Infotec has an ongoing relationship with a New York corporation to provide payments to NYIT in New York; (2) the contract between Infotec and NYIT was negotiated or executed in New York; (3) the contract contains a New York choice-of-law clause; and (4) the contract calls for performance to be supervised from New York or payments to be made into New York.

12.     In furtherance of its private interests under the Infotec Agreement, Infotec wrongfully interfered with the Teaching Agreement between Plaintiff and defendant NYIT.

**Procedural History**

New York State Division of Human Rights Action ("DHR Action")

13.     On December 9, 2008, Plaintiff executed a complaint with the New York State Division of Human Rights ("DHR") against NYIT alleging discrimination in boycott/blacklisting, educational institutions and employment on the basis of Plaintiff's color, religion, race and national origin (the "DHR Complaint").

14.     The DHR Complaint was received by the DHR on December 26, 2008.

15.     On July 27, 2010, a "fact-finding hearing" was held at the DHR regional offices in Hempstead, New York (the "DHR Hearing"), wherein Plaintiff and his witness, Professor Christopher Moylan, gave testimony regarding the discrimination alleged against NYIT in Plaintiff's DHR complaint.  NYIT failed to provide any witnesses at the DHR Hearing.

16.     On August 23, 2010, the DHR issued a Determination and Order After Investigation (the "DHR Determination"), wherein the DHR found: (1) that the DHR did not have jurisdiction over unlawful discriminatory acts against Plaintiff which occurred outside of New York State, relying on the New York State Court of Appeals' holding in Hoffman v. Parade Publications, 15 N.Y.3d 285 (N.Y. Ct. of App., July 1, 2010); and (2) "[t]he [Plaintiff] failed to state any Boycott/Blacklisting or Employment adverse actions that occurred in New York that were motivated by discrimination on the basis of his race, creed, or national origin, rather than being motivated by the difficulty if not impossibility of continued employment given the decisions taken at NYIT Bahrain." The DHR Determination also included notice that the DHR Complaint was also filed under Title VII of the Civil Rights Act of 1964 and that Plaintiff could request a review of the DHR Determination by the Equal Employment Opportunity Commission ("EEOC") in writing within 15 days of Plaintiff's receipt of the DHR Determination.

Equal Employment Opportunity Commission Action ("EEOC Action")

17.     On September 9, 2010, Plaintiff wrote to the EEOC to request a review of the DHR Determination.

18.     On November 4, 2010, the EEOC issued a Dismissal and Notice of Rights ("EEOC Right to Sue") letter to Plaintiff, wherein the EEOC indicated that it had adopted the findings of the DHR and advised Plaintiff of his right to file suit under federal law based on the charges alleged in the DHR complaint within ninety (90) days of his receipt of the EEOC Dismissal.

19.     The EEOC Right to Sue was received by Plaintiff's attorneys on November 8, 2010.

6

## PARTIES

20.    Plaintiff Dennis Balk is a professor of fine arts and computer graphics and is presently providing academic services in Southeast Asia.

21.    Defendant NYIT is an non-profit, New York educational corporation maintaining offices at 1849 Broadway, New York, New York and Northern Boulevard, P.O. Box 8000, Old Westbury, New York, which grants undergraduate and graduate university degrees accredited by the Middle States Association of Colleges at campuses in New York and throughout the world, including in the Middle East.

22.    At all times that Plaintiff was employed by defendant NYIT, NYIT was an employer as defined under 42 U.S.C. § 2000e(b) and Plaintiff was an employee as defined under 42 U.S.C. § 2000e(f).   Plaintiff further meets the criteria to qualify as an employee for the purposes of Title VII set forth by the Supreme Court of the United States in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), as set forth below:

   a.   NYIT controlled the manner and means of Plaintiff's teaching and Plaintiff was obliged to follow protocols for specific degrees as determined by NYIT and as the director of the computer graphics program was required to attend regular meetings with the dean who issued regular directives to Plaintiff detailing what Plaintiff was required to perform.

   b.   The skills required to be the director of NYIT's computer graphics program at NYIT in Bahrain were substantial and Plaintiff was hired because of his exceptional talent, reputation and because of his status as an exhibiting artist.

c.  All tools and materials used by Plaintiff in fulfilling his teaching obligations were provided by defendant NYIT.   Defendant NYIT specifically requested and required Plaintiff to perform his services on NYIT's premises in Bahrain.

d.  Plaintiff was required to teach for specific academic years and all courses taught by Plaintiff were determined and prescribed by defendant NYIT.

e.  Defendant NYIT had the right to and frequently did assign additional assignments to Plaintiff without providing additional compensation.  Plaintiff attended regular meetings with the dean to review Plaintiff's job performance and the dean would frequently require that Plaintiff add a particular component to his teaching.

f.  Plaintiff's job was full-time and Plaintiff was required to be on campus for a specific number of hours which were tracked by security.  Plaintiff was required to teach a specific course load and to maintain regular office hours, all under the supervision and control of defendant NYIT.  Plaintiff worked up to sixty (60) hours per week and was not permitted to take another job.

g.  Plaintiff was paid a regular salary, was provided health insurance by defendant NYIT, and defendant NYIT made bi-weekly direct deposits of salary payments due to Plaintiff into Plaintiff's bank account in New York City.

h.  Plaintiff had no discretion to hire and pay his own assistants.  All other employees who worked under Plaintiff as the director of the computer graphics program were hired by NYIT and their relationship with Plaintiff was dictated by NYIT.

i.  NYIT is in the business of providing educational facilities and degree programs utilizing professional, college-level teachers and defendant NYIT hired Plaintiff to further that business.

j.  Plaintiff was issued "Form 1099s" at the end of each taxable year so that, upon information and belief, NYIT would not be required to pay applicable payroll taxes and to avoid all other obligations arising as a matter of law with respect to Plaintiff's status as an employee.

23.  Defendant Infotec is a for-profit corporation incorporated in the Republic of Cyprus and registered by the Ministry of Education of the Arab Republic of Egypt and maintaining administrative offices at 23 Dr. ElSobky Street, Dokki, Giza, Cairo, Egypt, which provides administrative support services to American undergraduate and graduate university degree programs throughout the Middle East.

24.  Defendant Infotec is a party to a 10-year agreement with NYIT dated December 16, 2005 ("the Infotec Agreement"), wherein Infotec provides administrative services, including administrative personnel, to NYIT for certain NYIT educational programs in the Middle East, including in Bahrain.  A copy of the Infotec Agreement is annexed hereto as Exhibit "1."

## FACTUAL ALLEGATIONS

25.  In or about June 2006, NYIT hired Plaintiff to be the Director of Computer Graphics Department at NYIT Bahrain pursuant to a written agreement.  Plaintiff began his teaching duties in or about June 2006.

26.  When Plaintiff began his duties as a professor, NYIT, upon information and belief, failed to disclose to Plaintiff that NYIT had developed a policy to discriminate in favor of Muslim culture and Muslim practices so as to attract and maintain a student body which would pay full tuition and not be subject to normal academic standards.

27.     Throughout Plaintiff's employment with NYIT, Plaintiff attempted to provide an overview of art appreciation in the global art world such that Plaintiff's teachings were culture neutral and information positive.

28.     During the first year of Plaintiff's employment, Plaintiff was positively reviewed and his employment was renewed for another year on or about April 3, 2007, when NYIT and Plaintiff executed a second written agreement for Plaintiff's services for the period of June 1, 2007, to May 31, 2008 (the "Teaching Agreement").

29.     Western faculty regularly challenged the record keeping practices of Infotec and NYIT and learned that attendance and academic records had disappeared.

### Plaintiff's Proper Performance of His Duties

30.     In or about February, 2008, Plaintiff had a conversation with two students attending NYIT Bahrain (the "NYIT Bahrain Students") about their impending trip to New York. Plaintiff properly discussed the difference between the different social norms and treatment of religion in Bahrain and New York City with respect to the subject matter of the course Plaintiff was hired to teach by NYIT. Plaintiff's discussion of the differences between secular and religious societies reportedly offended the NYIT Bahrain Students.

31.     The Dean of Students, Dean Reginald, reportedly heard about the NYIT Bahrain Students' complaint and reportedly directed the NYIT Bahrain Students to submit a confidential letter describing the circumstances. The NYIT Bahrain Students reportedly did so (the "NYIT Bahrain Students' Travel Complaint"), but then the NYIT Bahrain Students reportedly circulated the NYIT Bahrain Students' Travel Complaint to the staff of NYIT and to the Royal Family of Bahrain.

32.     The Campus Dean, Damon Revelas, then had a meeting with Plaintiff where Dean Revelas stated to Plaintiff that there had been no wrongdoing with respect to the ongoing NYIT Bahrain Students' Travel Complaint and everything was resolved.  Indeed, Dean Revelas stated that he spoke to the NYIT Bahrain Students and the NYIT Bahrain Students signed a document stating that everything was resolved with respect to the NYIT Bahrain Students' Travel Complaint, which was also signed by Dean Reginald and Cyrus Reed[1], Vice President for Global Academic Programs, as witnesses. However, due to the leak, the rumors about the NYIT Bahrain Students' Travel Complaint persisted and evolved.

### Discrimination Against Plaintiff

33.     When Plaintiff was criticized for statements which purportedly offended Muslim students, what was at issue was not what Plaintiff said but that Plaintiff was white, non-Muslim and an American citizen.  NYIT and Infotec acted upon the criticism by discriminating against Plaintiff because of his race, creed and national origin and the fact that NYIT saw Plaintiff's race, creed and national origin as provocative and potentially damaging to NYIT's ability to attract Muslim students and make money by offering degree-granting programs in the Middle East.

34.     Unbeknownst to Plaintiff and despite NYIT's statements that everything was resolved, Cyrus Reed and other NYIT Infotec Personnel had decided to oust Plaintiff and began working behind the scenes with Infotec employees to achieve this goal.

35.     At that time, Christopher Moylan, who is currently a tenured professor of English at NYIT, who has taught at NYIT Bahrain and who testified at the DHR Hearing as to the illegal discrimination against Plaintiff, was an NYIT administrator in New York privy to NYIT's internal decision-making regarding Plaintiff.  Professor Moylan has stated that everybody at

NYIT knew that Plaintiff had not done anything wrong. Still, Mr. Moylan testified that Cyrus Reed wanted Plaintiff out of Bahrain.

## **False Statements Concerning Plaintiff Circulated by NYIT**

36.     On March 1, 2008, Alayam, a Bahraini Daily Newspaper, published an article (the "March 1 News Article") falsely stating that a "professor" (Plaintiff) had posted to his class website the controversial Danish cartoon depicting the prophet Mohammed in ragged clothing (the "Danish Cartoon"). Everyone at NYIT knew that the March 1 News Article referred to Plaintiff and it was clear to NYIT officials that the March 1 News Article was false, and that Plaintiff had not done the acts of which the March 1 News Article accused him. In addition, the March 1 News Article falsely stated that other NYIT Bahrain Students would be signing a petition to remove Plaintiff from NYIT when, in fact, students later reportedly signed a petition supporting Plaintiff.

37.     The March 1 News Article was published in Arabic, however, in or about March,

2008, Dean Revelas provided to Plaintiff the following translation of the March 1 News Article

in full:

**Saturday, March 01, 2008**

**A Private University Suspends a Professor after republishing controversial cartoon
of the Prophet Muhammad**

ALAYAM* was informed that one of the private universities in Bahrain suspended one
of its professors as he republished the controversial cartoon of the Prophet Muhammad
on his private website.

Students stated that they got surprised last week when they were exploring the website of
the Professor to get information in regards to their course material from the website and
they were shocked to see the controversial cartoon character about Prophet Muhammad,
making them very upset.

Students have also informed ALAYAM that there have **been severe disputes** between the
Professor and Bahraini and GCC (Saudi Arabia, Qatar, Kuwait, UAE etc) Students. As an
outcome of this conflict, students complained against the Professor to the President.

Students said that the President of the University responded to the complaints and
suspend the Professor for a limited period. However, they were again surprised since the
professor went back to work two days ago. The students have requested the Ministry of
Education and the Higher Education Council to investigate the matter.

Students will be signing a petition to have the Professor evicted from the University.


*: ALAYAM: Bahraini Daily Newspaper


35.     On or about March 2, 2008, the very next day, the owner of defendant Infotec, Dr.

Mohamed Hussein, demanded that Plaintiff immediately cease providing services for NYIT

Bahrain and insisted that Plaintiff leave Bahrain immediately on the next available flight, for

which Dr. Hussein had already made arrangements. Dr. Hussein assured Plaintiff that he knew

that the NYIT Bahrain Students' Travel Complaint and the March 1 News Article were

unfounded and that everything was resolved.  Dr. Hussein reminded Plaintiff about a discussion

he had with the NYIT Bahrain Students and other students, the upper echelon staff of NYIT, including Dean Revelas, Dean Reginald, and Mr. Reed, which resolved all issues with respect to the Students' Travel Complaint.  Dr. Hussein further stated, however, that Plaintiff must leave "for a couple of weeks until the incident was blown over."  Plaintiff was told by Dr. Hussein that he had no time to gather his belongings or even say goodbye to anyone.

38.     A member of Dr. Hussein's staff then secreted Plaintiff to the Bahrain airport and escorted him to the departure gate via special procedures that allowed him to skip lines and expedite customs. Plaintiff did not even know his destination and was told to keep his trip a secret and speak to nobody when he arrived at his then unknown destination.

39.     Sometime between March 1, 2008 and March 6, 2008, NYIT officials in New York reportedly became concerned about how best to handle the negative press about NYIT contained in the March 1 News Article. Rather than tell the truth and deny the incident, NYIT instead decided to further defame, disparage and scapegoat Plaintiff, falsely painting him as an anti-Muslim who NYIT had properly removed.

40.     Upon information and belief, NYIT's decision to continue to republish the untrue March 1 News Article was due, among other things, to selfish business considerations. NYIT's name lends credibility to its franchise university in Bahrain and provides profitability for NYIT, Bahrain and NYIT Bahrain. However, the Ministry of Education in "business-friendly Bahrain," as its global advertisements promote the country, reportedly periodically reviews NYIT to determine if the government wants to continue to issue licenses and accreditations to NYIT Bahrain. Accordingly, NYIT must accede to the Bahraini government's demands if it wishes to remain in Bahrain. Indeed, the Royal Family reportedly consistently demanded certain favors

from NYIT Bahrain, including forcing NYIT to violate its own academic policies, including graduation requirements, with respect to members of the Royal Family.

41.     For these and other reasons, NYIT discriminated against Plaintiff by endorsing and affirming the demonstrably false and defamatory statements contained in the March 1 News Article. On or about March 5, 2008, NYIT also ratified, endorsed and affirmed the false and defamatory statements in the March 1 News Article, as well as other false accusations against Plaintiff, when it stated and republished to Habib Toumi, the Bureau Chief of the United Arab Emirates daily newspaper Gulf News, the verbatim false and defamatory statement that NYIT decided to "sack" Plaintiff for his alleged actions in posting the Danish Cartoon to his website, which resulted in "concerns about the safety of the professor, a desire to preserve its reputation and a move to ensure the stability of classes following an increase in calls to sack him" (collectively, the "False and Defamatory Statements").

42.     On or about March 6, 2008, Bureau Chief Toumi published an article in the Gulf News (the "March 6 News Article") which republished and elaborated upon the False and Defamatory Statements in the March 1 News Article. The March 6 News Article repeated the False and Defamatory Statements; portrayed NYIT as having ratified, endorsed and affirmed the False and Defamatory Statements in the March 1 News Article after Bahrain's Ministry of Education intervened; and quoted the above statement that NYIT decided to "sack" Plaintiff after posting the Danish Cartoon as NYIT had "concerns about the safety of the professor, a desire to preserve its reputation and a move to ensure the stability of classes following an increase in calls to sack him." Plaintiff had never posted the subject Danish Cartoon on his or any website.

43.     The March 6 News Article was originally published in print in Arabic and on the Gulf News website in English, and states in full:

  

Print this page

### Teacher fired for Danish cartoons on website
http://archive.gulfnews.com/articles/08/03/06/10195062.html

03/06/2008 07:31 PM | By Habib Toumi, Bureau Chief

Manama: An American professor has been sacked for publishing Danish cartoons of the Prophet Mohammad (PBUH) on his website, causing outrage among university students.

"The professor highlighted the cartoons on his personal website which students routinely surfed to download notes about his course and related articles," students at the university told Gulf News.

"Many incensed stud-ents, mainly from Bahrain and Saudi Arabia, protested vehemently and argued with the professor, and eventually reported him to the president of the university for insulting Islam," one of the students said.

The university has not commented.

**Suspension**

However, student sources said the professor was temporarily suspended, and upon resuming teaching, he faced a barrage of criticism from the students who asked the education ministry and the higher education council to apply a zero-tolerance policy towards anyone who offended Muslims by reprinting or republishing the "insulting" cartoons.

"The university eventually backtracked on its decision to reinstate the professor and sacked him despite a formal apology and the removal of the cartoons from his website," the sources said.

The university, which offers courses in business, accounting, finance and marketing, attributed its decision to "concerns about the safety of the professor, a desire to preserve its reputation and a move to ensure the stability of classes following an increase in calls to sack him."

44.     Christopher Moylan is currently a tenured professor of English at NYIT who has taught at NYIT Bahrain and who was an NYIT administrator in New York with knowledge of NYIT's internal decision-making regarding Plaintiff during the events described herein and gave sworn testimony related thereto at the DHR Hearing on July 27, 2010.

45.     Mr. Moylan testified about the existence of Infotec, a for-profit corporation incorporated in the Republic of Cyprus administering undergraduate and graduate university degree programs in various countries in the Middle East, including Bahrain.

46.    Infotec and NYIT entered into a contract in 2001 and a subsequent 10 year contract in 2005 (the "Infotec Agreement") for Infotec to provide exclusively to NYIT the facilities and administrative services necessary for NYIT to offer its academic program in the Middle East as set forth in Exhibit "1."

47.    On August 9, 2010, in response to information requested by DHR Investigator Betty Russell, NYIT's general counsel Stephen Kloepfer submitted an affidavit in the DHR Action concerning the relationship between Infotec and NYIT, wherein Mr. Kloepfer stated as follows: "Infotec is a wholly separate and independent [from NYIT] for-profit corporate entity whose President and majority shareholder is Dr. Mohamed Yossry Hussein."

48.    In the Infotec Agreement, NYIT retained "sole discretion" relating to decisions about academics, students, professors and compensation. NYIT and Infotec agreed to share in the tuition paid by students.

49.    Pursuant to the Infotec Agreement, Infotec provides to NYIT the administrative services set forth in relevant part below:

> (1) "...recruiting qualified students into the academic programs NYIT offers in the Middle East;"
> (2) "...provid[ing] all necessary and appropriate academic facilities and administrative arrangements for NYIT to conduct its academic programs in the Middle East...;"
> (3) "...advertising and promoting NYIT's programs in the Middle East...;"
> (4) "...evaluat[ing] the credentials of prospective students and recommending to NYIT only those who meet NYIT's admissions requirements...;"
> (5) forwarding "[a]ll applications for admission, supporting documentation and fees [...] to NYIT in New York;"
> (6) with the approval of NYIT, "...supplement[ing] the compensation of approved part-time faculty teaching in the Middle East;"
> (7) "...advis[ing] and assist[ing] students wishing to attend NYIT's programs in New York and [...] provid[ing] them with help in obtaining visas and arranging for accommodations in New York," in consideration of which "NYIT [pays] Infotec 20% of the net tuition paid by students transferring from NYIT's programs in the Middle East to its New York based programs;" and

17

(8) "...collecting all tuition and fees owed by students enrolled in degree credit programs Infotec manages for NYIT," in consideration of which "10% of the total will be allocated for license and permit fees..." and the "remaining revenue will be divided equally, 50% to NYIT and 50% to Infotec."

(Exhibit "1")

50.     Professor Moylan testified that NYIT and Infotec personnel, consisting of, among others, Cyrus Reed, Noof Al-Khalifa and Ahmed Fuod, wanted Plaintiff out of Bahrain and were willing to make whatever false and defamatory statements necessary to achieve that goal. Professor Moylan testified that NYIT and Infotec schemed to have the Bahraini newspapers publish a false and fabricated story that Plaintiff published the Danish cartoon of the Prophet Mohamed to his website and insulted Islam, but to have the newspaper attribute the comments to student sources and leave Plaintiff's name out in order to avoid NYIT's fingerprint of manipulation. Professor Moylan testified that NYIT and Infotec carried this out by having Noof Al-Khalifa contact students and parents with influential royal family ties to "place the story... in the Gulf Daily News."

51.     The "story," which Professor Moylan testified was "placed" in the Gulf News on March 6, 2008, is set forth below:



**Print this page**

## Teacher fired for Danish cartoons on website

http://archive.gulfnews.com/articles/08/03/06/10195062.html

03/06/2008 07:31 PM | By Habib Toumi, Bureau Chief

Manama: An American professor has been sacked for publishing Danish cartoons of the Prophet Mohammad (PBUH) on his website, causing outrage among university students.

"The professor highlighted the cartoons on his personal website which students routinely surfed to download notes about his course and related articles," students at the university told Gulf News.

"Many incensed stud-ents, mainly from Bahrain and Saudi Arabia, protested vehemently and argued with the professor, and eventually reported him to the president of the university for insulting Islam," one of the students said.

The university has not commented.

**Suspension**

However, student sources said the professor was temporarily suspended, and upon resuming teaching, he faced a barrage of criticism from the students who asked the education ministry and the higher education council to apply a zero-tolerance policy towards anyone who offended Muslims by reprinting or republishing the "insulting" cartoons.

"The university eventually backtracked on its decision to reinstate the professor and sacked him despite a formal apology and the removal of the cartoons from his website," the sources said.

The university, which offers courses in business, accounting, finance and marketing, attributed its decision to "concerns about the safety of the professor, a desire to preserve its reputation and a move to ensure the stability of classes following an increase in calls to sack him."

52.     As more fully set forth infra, everything from the title of the March 6 News Article to its text, to the statements initially published by the Infotec personnel to reporter Toumi, were knowingly false and defamatory. Plaintiff never posted the Danish cartoon insulting the Prophet Mohammad and was only accused, falsely and publicly, of doing so as part of NYIT and the NYIT Infotec Personnel's scheme to oust Plaintiff from the Bahrain campus, as confirmed by Professor Moylan.

19

53.     By causing the false and defamatory statements to be published about Plaintiff, Infotec knowingly and intentionally interfered with Plaintiff's ability to competently perform services under the Teaching Agreement.

54.     Professor Moylan also testified that Infotec was advised by NYIT in New York concerning the publication of the false and defamatory statements

55.     Upon information and belief, Robert Michael Smith, NYIT Global Coordinator of Middle East Fine Arts and Computer Graphics Programs, wrote in an e-mail on November 13, 2008, "…these excellent facilities are due mostly to the hard work efforts of Dennis Balk, the well-loved art professor who was run out of the Middle East by false accusations."

56.     Upon information and belief, Robert Michael Smith wrote in an e-mail on November 29, 2008, "…when we sent Lon Kaufmann to Bahrain to fill the void after Dennis Balk was chased out of the Middle East due to exaggerated rumors…"

## FIRST CAUSE OF ACTION

### Racial Discrimination Under Title VII Against NYIT

57.     Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs 1 through 56 with the same force and effect as though more fully set forth at length herein.

58.     By the acts and practices described above, including by not limited to forcing Plaintiff to abandon his teaching position in Bahrain by creating a hostile work environment through the publication of the defamatory articles in the Bahraini news, NYIT discriminated against Plaintiff in the terms and conditions of his employment on the basis of his race in violation of Title VII.

59.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of NYIT's discriminatory acts.

60.     NYIT acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

SECOND CAUSE OF ACTION

Religious Discrimination Under Title VII Against NYIT

61.     Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs 1 through 60 with the same force and effect as though more fully set forth at length herein.

62.     By the acts and practices described above, including by not limited to forcing Plaintiff to abandon his teaching position in Bahrain by creating a hostile work environment through the publication of the defamatory articles in the Bahraini news, NYIT discriminated against Plaintiff in the terms and conditions of his employment on the basis of his religion in violation of Title VII.

63.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of NYIT's discriminatory acts.

64.     NYIT acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

THIRD CAUSE OF ACTION

National Origin Discrimination Under Title VII Against NYIT

65.     Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs 1 through 64 with the same force and effect as though more fully set forth at length herein.

66.     By the acts and practices described above, including by not limited to forcing Plaintiff to abandon his teaching position in Bahrain by creating a hostile work environment

21

through the publication of the defamatory articles in the Bahraini news, NYIT discriminated against Plaintiff in the terms and conditions of his employment on the basis of his national origin in violation of Title VII.

67.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of NYIT's discriminatory acts.

68.     NYIT acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

FIFTH CAUSE OF ACTION

Intentional Interference with Contract Rights Against Infotec

69.     Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs 1 through 68 with the same force and effect as though more fully set forth at length herein.

70.     On or about April 3, 2007 NYIT entered into the Teaching Agreement with Plaintiff for the period of June 1, 2007 to May 31, 2008.

71.     Defendant Infotec had actual knowledge of the Teaching Agreement between NYIT and Plaintiff and at all relevant times was a third party to the teaching agreement.

72.     In furtherance of its private interests, defendant Infotec intentionally induced NYIT to breach the Teaching Agreement and prevented Plaintiff from being able to perform his obligations under the Teaching Agreement.   Infotec prevented Plaintiff from competently performing his obligations under the Teaching Agreement because Infotec sought to discredit Plaintiff, make Plaintiff a target of extremist Muslims, and requiring Plaintiff to leave Bahrain by accusing Plaintiff of publishing the Danish cartoon to his website.

73.     Infotec's actions directly caused Plaintiff significant pecuniary harm.  As a result of Infotec's interference, among other things, Plaintiff's professional reputation was damaged;

Plaintiff was terminated from his teaching position; Plaintiff was prevented from renewing a two-year contract promised to him by the Dean for at least $172,000 due directly to the complained conduct; Plaintiff was unable to find a replacement job; Plaintiff had to go into hiding for fear of being killed as a result of defendant Infotec's publication of the March 6 News Article; Plaintiff had to relocate his life at great expense of at least $30,000; Plaintiff had to abandon his property and belongings worth in excess of $200,000.00; Plaintiff was unable to show several pieces of art in planned exhibitions at which each piece which he expected to sell for at least $5,000.

74.    As a result of the foregoing, Plaintiff has been damaged in an amount in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an award:

(a) declaring the acts and practices complained of herein are in violation of Title VII;

(b) enjoining and permanently restraining these violations of Title VII;

(c) directing defendants to pay Plaintiff punitive damages as provided by Title VII;

(d) directing defendants NYIT and Infotec to compensate Plaintiff;

(e) awarding Plaintiff such interest as is allowed by law;

(f) awarding Plaintiff his reasonable attorneys' fees and costs; and

(g) granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

a trial by jury in this action.

Dated: New York, New York
       February 1, 2011

Yours, etc.

KORNFELD & ASSOCIATES, P.C.

By:_____
    Randy Kornfeld (RK 9908)
    570 Lexington Avenue, 17th Floor
    New York, New York, 10022
    (212) 759-6767

1

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY™



# AGREEMENT BETWEEN
# NEW YORK INSTITUTE OF TECHNOLOGY
# AND
# INFOTEC CORPORATION

This Agreement is entered into this 16th day of December, 2005 by and between

The New York Institute of Technology (hereafter "NYIT"), a higher education institution chartered by the New York State Board of Regents and maintaining principal administrative offices in Old Westbury, New York 11568

and

INFOTEC, a corporation incorporated in the Republic of Cyprus and registered by the Ministry of Education of the Arab Republic of Egypt and maintaining principal administrative offices in Cairo, Egypt.

NYIT is a non profit, independent, senior institution of higher learning which offers undergraduate and graduate university degrees accredited by the Middle States Association of Colleges and other professional accrediting agencies.

INFOTEC is a corporation which provides administrative support services to American undergraduate and graduate university degree programs throughout the Middle East, either independently or in association with local accredited universities.

Both NYIT and INFOTEC wish to continue their cooperative relationship, as specified below, in order to provide students in the Middle East with the opportunity to complete an undergraduate or graduate degree program and earn a degree from a United States university. In order to accomplish these objectives, both NYIT and INFOTEC agree to the following:

1. NYIT will offer to qualified students selected undergraduate and graduate degree programs and non-credit certificate programs, through a combination of traditional on-site, distance learning and on line courses offered in several countries in the Middle East.

2. INFOTEC will be responsible for recruiting qualified students into the academic programs NYIT offers in the Middle East. INFOTEC will provide all necessary and appropriate academic facilities and administrative arrangements for NYIT to conduct its academic programs in the Middle East at a level of academic quality which meets all of the standards and requirements of NYIT and NYIT's accrediting agencies, as well as the standards and requirements of the Ministry of Education in each of the countries in which INFOTEC provides administrative support to NYIT.

1

3. INFOTEC will be responsible for all expenses associated with advertising and promoting NYIT's programs in the Middle East and for all expenses associated with the recruitment of students into these programs. NYIT will make available for recruitment purposes an appropriate number of current catalogs, program brochures and other recruitment and promotional materials. NYIT shall review and approve, in advance, the contents of all advertising, promotional and recruitment materials, the NYIT name and logo and any representation of its programs produced or distributed by INFOTEC.

4. INFOTEC shall evaluate the credentials of prospective students and recommend to NYIT only those who meet NYIT's admissions requirements, including the requirement for proficiency in English, and who are qualified for admission to NYIT's programs. All applications for admission, supporting documentation and fees shall be forwarded by INFOTEC to NYIT in New York. All admissions decisions will be made by the NYIT admissions office.

5. Instructors shall be drawn from the NYIT faculty as well as from local universities and institutions of higher education. All instructors teaching any courses bearing degree credit in these programs shall hold appropriate credentials, which shall be a minimum of a master's degree and, generally, a Ph.D. NYIT shall review and evaluate all credentials and shall have the sole discretion to approve faculty appointments.

6. NYIT shall be responsible for the compensation of faculty. NYIT shall annually review and establish, at its sole discretion, all faculty compensation rates.

7. After first consulting with NYIT, INFOTEC may supplement the compensation of approved part-time faculty teaching in the Middle East.

8. As the degree granting institution, NYIT reserves the right, at its sole and absolute discretion, to establish admission, program and degree requirements, curriculum and course content, grading standards and all other matters pertaining to academic standards and policies, including all academic policies and decisions relating to students, faculty and academic administrators.

9. All instruction, academic work by students and examinations in all courses will be conducted in English.

10. All students admitted to NYIT's programs in the Middle East and who are in good academic standing will automatically be admitted to NYIT's programs in New York and to any of NYIT's campuses worldwide, and will be encouraged to complete at least part of their degree programs in New York. Students transferring between NYIT's campuses shall pay the tuition and fees charged at the campus they attend. Scholarship assistance may be available to students transferring from NYIT's campuses in the Middle East to NYIT's campuses in New York. INFOTEC will advise and assist students wishing to

attend NYIT's programs in New York and will provide them with help in obtaining visas and arranging for accommodations in New York. NYIT shall pay INFOTEC 20% of the net tuition paid by students transferring from NYIT's programs in the Middle East to its New York based programs.

11. NYIT will annually establish tuition rates for both undergraduate and graduate degree programs at each of the sites at which its programs are offered under this contract.

12. INFOTEC will be responsible for collecting all tuition and fees owed by students enrolled in degree credit programs it manages for NYIT under this contract.

13. Allocation of the total tuition revenue for degree credit programs for each campus site will be as follows: 10% of the total will be allocated for license and permit fees and made available to INFOTEC to meet these expenses. INFOTEC shall provide to NYIT documentation of these licenses, permits, and related fees, upon NYIT's request. The remaining revenue will be divided equally, 50% to NYIT and 50% to INFOTEC.

14. Each academic quarter, INFOTEC will deposit 25% of NYIT's share of the revenue, in U. S. dollars, into a local NYIT bank account, no later than 30 days after the start of the quarter.

15. Each academic quarter INFOTEC will document the previously agreed upon expenses that it has paid for NYIT for faculty salaries, fringe benefits and local expenses for NYIT administrators, etc. These expenses will be deducted from the remaining 75% of NYIT's share of the total tuition revenue. The resulting amount, in U. S. dollars, will then be deposited by INFOTEC into a local NYIT bank account, upon receipt by INFOTEC of student grades for that quarter, but no later than 30 days after the end of that quarter.

16. No later than 30 days following the end of each academic quarter, NYIT and INFOTEC will reconcile all tuition and fee payments due NYIT from INFOTEC and all scholarship, license, permit and any related fees, salary, fringe benefits, local expenses for NYIT administrators, travel and any other expenses charged to NYIT by INFOTEC. All payments made to and expenses charged to NYIT must be supported by appropriate documentation. The form of these reconciliations shall be agreed upon in advance by both NYIT and INFOTEC. At NYIT's request, INFOTEC shall make available to NYIT's outside auditors all documents and records relating to all payments made to and expenses charged to NYIT by INFOTEC, and all documents and records relevant to the reconciliations cited above.

17. No later than 120 days after signing this agreement, NYIT and INFOTEC shall reach final agreement on all outstanding financial issues from prior academic quarters through the fall 2005 academic quarter.

3

18. In recognition of INFOTEC's responsibility to extensively advertise and promote NYIT's programs throughout the Middle East, NYIT shall pay to INFOTEC 20% of the net tuition paid by students, in excess of the first 20 students, who apply and matriculate directly into NYIT's programs in New York from Middle East countries, excluding Israel.

19. NYIT and INFOTEC shall cooperate in offering non-credit English Language and *other non-credit training and certificate programs. INFOTEC shall be free to decide* which non-credit courses it wishes to offer, and shall be free to establish the tuition to be charged. However, INFOTEC shall submit to NYIT all non-credit courses and the resumes of all faculty teaching non-credit courses for NYIT's review and approval. INFOTEC shall be responsible for all costs associated with offering non-credit programs. NYIT shall provide advice and, where appropriate, materials relating to curriculum and program content and standards for non-credit courses. Certificates of completion shall be awarded by NYIT to students upon their completion of non-credit programs approved by NYIT. INFOTEC shall pay NYIT 10% of the total gross tuition revenue owed by students for non-credit courses.

20. INFOTEC shall document enrollment in non-credit courses and shall pay to NYIT its share of tuition within 10 days of the end of each quarter.

21. If INFOTEC wishes to manage a degree program which NYIT does not offer, or NYIT wishes to offer a degree program for which INFOTEC does not want to provide administrative support, both NYIT and INFOTEC will work together to find a third partner to work with.

22. NYIT shall appoint and be responsible for compensation of an on-site campus academic dean at each Middle East campus location and an on-site academic coordinator for each major offered at each site. NYIT shall arrange for Dr. Mohamed Hussein to interview and make a recommendation to NYIT prior to appointing the campus academic deans and other senior administrative personnel assigned to fill positions in the Middle East.

23. INFOTEC shall pay for and provide office space and secretarial support to NYIT's academic administrators in the Middle East and shall be responsible for paying for and providing general office support, such as telephones, fax and postage expenses. NYIT shall be responsible for any necessary travel expenses of its academic administrators within the Middle East.

24. Any sites where courses and degree programs are offered by NYIT and managed by INFOTEC shall be available for evaluation and inspection by NYIT or its representatives, or by any of its accrediting agencies, at any time. Site visits by NYIT shall be made periodically but no less often than once each semester. All such visits by NYIT or its accrediting agencies will be at the expense of NYIT.

4

25. In countries where INFOTEC provides administrative support services to NYIT, INFOTEC shall be responsible for obtaining all licenses, permits and authorizations required to offer degree granting programs. INFOTEC shall be responsible for all costs associated with obtaining these documents or authorizations. Although licenses, permits or authorizations may be listed solely in NYIT's name, NYIT and INFOTEC shall each own, equally, 50% of all such licenses, permits and authorizations. Both NYIT and INFOTEC agree to give a "right of first refusal" to the other before selling, leasing, transferring or assigning use or ownership of these licenses, permits or authorizations to a third party.

26. NYIT shall grant INFOTEC exclusive rights to provide administrative support services to NYIT's academic programs in all Arab League Nations in the Middle East. These rights may be extended to other countries upon the mutual consent of NYIT and INFOTEC.

27. INFOTEC and Dr. Mohamed Hussein, and any corporation or business enterprise with which he is associated or in which he has an interest, shall not represent or establish academic courses or degree programs with any other university or institution of higher education during the term of this contract or for a period of four years following the termination of this contract, for any reason, by either party.

28. INFOTEC represents that this agreement complies in all respects with the relevant laws applying at the time of its execution in each of the countries in which it provides administrative support services to NYIT's academic programs, and that it shall not permit or maintain any condition or activity which violates or does not fully comply with the law, interferes with the program or discredits NYIT's reputation. INFOTEC and Dr. Mohamed Hussein further represent that this agreement is not in violation of any contract or legal agreement currently in effect to which either INFOTEC or Dr. Mohamed Hussein is a party. INFOTEC and Dr. Mohamed Hussein shall defend, indemnify and hold harmless NYIT and its officers, trustees, employees, attorneys, and agents (the "Indemnitees") from all costs and expenses, including any judgments and attorneys' fees, incurred by any Indemnitee arising out of any breach of this representation or obligation by INFOTEC or Dr. Mohamed Hussein.

29. NYIT represents that this agreement complies in all respects with the relevant laws applying at the time of its execution in the United States, and that it shall not permit or maintain any condition or activity which violates the law, interferes with the program, or discredits INFOTEC's reputation. NYIT further represents that this agreement is not in violation of any contract or legal agreement currently in effect to which NYIT is a party. NYIT shall indemnify INFOTEC for all costs and expenses, including any judgments and attorneys' fees, arising out of this representation and obligation.

5

30. INFOTEC shall defend, indemnify and hold harmless NYIT and its officers, trustees, employees, attorneys and agents (the "Indemnitees") from all liability, damages, fines, costs, including attorneys' fees, claims or judgments incurred by any Indemnitee arising out of the use, management, operation or ownership of INFOTEC's sites and facilities in the Middle East.

31. NYIT shall defend, indemnify and hold harmless INFOTEC and its officers, trustees, employees, attorneys and agents (the "Indemnitees") from all liability, damages, fines, costs, including attorneys' fees, claims or judgments incurred by any Indemnitee arising out of the use, management, operation or ownership of NYIT's sites and facilities in the United States.

32. Discussions and negotiations shall first be attempted to resolve all matters not covered by this agreement and all differences of interpretation of this agreement. In the event of an unresolved dispute, either party may inform the other of its intent to terminate this contract, upon no less than ninety (90) days' notice. Upon such notification, no further students shall be enrolled in these programs. The parties shall then negotiate arrangements to enable those students who are already enrolled to complete their studies.

33. All provisions of this agreement are subject to accrediting agency standards and requirements. NYIT may terminate this contract in the event that it is not possible for either NYIT or INFOTEC, under the terms of this contract, to meet accreditation standards or requirements.

34. This agreement shall commence on December 16, 2005 and shall continue in full force for a period of ten years from the date of its execution.

35. This agreement may not be assigned.

36. This agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law. Each party agrees to submit any disputes hereunder to the exclusive jurisdiction and venue of a court of competent jurisdiction located in Nassau County or New York County, State of New York, and to submit to the in personam jurisdiction of such court. Service of process made to each party by certified mail, return receipt required, at the addresses listed below, shall be deemed good and sufficient service for all purposes ten (10) days from the date of mailing.

37. INFOTEC agrees that it will perform all services hereunder in accordance with all applicable US law and the reasonable directions of NYIT. Without limiting the foregoing, INFOTEC and NYIT each acknowledges that the Foreign Corrupt Practices Act of the U.S. ("FCPA)) makes it unlawful, among other things for a U. S. legal entity or anyone acting on its behalf, to make or offer payment, promise to pay, or authorize the

6

payment of anything of value to: (i) any officer, or employee of, or any persona acting in an official capacity for, a foreign government or any department, agency or corporation thereof, or any foreign political party, party official or candidate, or (ii) any person, with knowledge that all or a portion thereof will be offered, given or promised, directly or indirectly, to anyone described in (i) above, for the purpose of:

(1) influencing any act or decision by such person in his person in his official capacity; or (2) inducing him or her to use his or her influence with a foreign government to affect, either by action or inaction, any act or decision of such government to obtain or retain business for any person.

INFOTEC confirms its understanding of the requirements of the FCPA, agrees to comply with those requirements and to take no action that might cause NYIT or any of its subsidiaries or affiliates to be in violation of the FCPA, and agrees to execute and deliver to NYIT from time to time such certifications of compliance with the requirements of the FCPA as NYIT may require.

38. This agreement may not be modified, altered or amended except by a writing signed by authorized representatives of both parties.

39. This agreement is binding upon the parties and upon their representatives and successors.

40. This is the entire agreement of the parties on its subject, and there are no oral, collateral or other agreements or representations except as set forth herein.

41. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement. Each party may rely on facsimile signature pages as if such facsimile pages were originals.


Dr. Edward Guiliano, President
New York Institute of Technology
P. O. Box 8000
Old Westbury, N. Y. 11568

Dr. Mohamed Y. Hussein, President
INFOTEC
23 Dr. ElSobky St. (from Dokki St.)
Dokki, Giza, Cairo, Egypt

12/16/05
Date

1 2 / 1 6 / 2 0 0 5
Date

7

## ADDENDUM TO AGREEMENT

The Agreement between the New York Institute of Technology and INFOTEC, signed on December 16, 2005 covers the campuses and academic programs INFOTEC currently manages for NYIT in Jordan and Bahrain and is intended to cover all campuses and programs which NYIT offers in other Middle East countries.

This Addendum to that Agreement provides for a different financial relationship between NYIT and INFOTEC for the campuses and academic programs offered by NYIT in the United Arab Emirates.

NYIT has signed an Agreement with CERT, effective September 1, 2006 which specifies that CERT will provide various facilities and management services to NYIT for NYIT's academic programs in the UAE. For these facilities and services, CERT will receive 40% of the tuition revenue generated by NYIT's programs in the UAE. This Agreement between NYIT and CERT was signed with the full knowledge and consent of INFOTEC.

The remaining 60% of tuition revenue retained by NYIT will be divided between NYIT and INFOTEC as follows:

1. All of NYIT'S and INFOTEC'S direct educational and administrative expenses incurred in the operation of NYIT's programs in the UAE will be deducted from NYIT's 60% share of total tuition revenue. This will include faculty compensation, license and accreditation fees, administrative and faculty travel, scholarships and commencement costs, and any other costs which NYIT and INFOTEC mutually agree upon.

2. After deducting both NYIT's and INFOTEC's direct educational and administrative expenses incurred in the operation of NYIT's academic programs in the UAE, the remaining net revenue will be shared by NYIT and INFOTEC on a 50% -50% equal basis.

3. Dr. Mohamed Hussein will continue to serve as NYIT's Executive Chairman for the Middle East and will be responsible for supervising advertising, marketing and student recruitment for NYIT's programs in the UAE.

4. In agreeing to this Addendum, NYIT explicitly acknowledges the work done over the past two years and the substantial financial investment made by INFOTEC in developing this opportunity for NYIT and in establishing NYIT's campus in Abu Dhabi.

5.  This Addendum will become effective upon execution by both parties, will remain in effect through August 31, 2016, and may be amended at any time by a writing signed by both parties.  Except as supplemented or modified by this Addendum, all terms and conditions set forth in the Agreement will remain in full force and effect throughout the term of the Agreement.

Dr. Edward Guiliano
President
NYIT

Dr. Mohamed Hussein
President
INFOTEC

5/17/2006