UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

DENNIS BALK,

        **Plaintiff,**

       - against -

**NEW YORK INSTITUTE OF
TECHNOLOGY and INFOTEC
CORPORATION and MOHAMED YOSSRY
HUSSEIN,**

        **Defendants.**

--------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/15

## OPINION AND ORDER

11-cv-509 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Denis Balk brings ten claims against the New York Institute of
Technology ("NYIT") and other defendants alleging, *inter alia*, discrimination
under Title VII of the Civil Rights Act of 1964 ("Title VII") and breach of contract
and fraud under state common law. On December 15, 2014, NYIT and Balk filed
cross-motions for summary judgment under Rule 56(c) of the Federal Rules of
Civil Procedure, with NYIT moving for summary judgment with respect to the
First, Second, Third, Fourth, and Ninth Claims of Balk's Third Amended
Complaint and Balk moving for summary judgment against NYIT on his Sixth,

-1-

Seventh, Eighth and Ninth Claims.[1]  The upshot of these overlapping motions is that all claims relevant to NYIT are in dispute.  For the following reasons, NYIT's motion for summary judgment is GRANTED in full and Balk's motion for summary judgment is DENIED in full, dismissing all claims against NYIT.

## II.    BACKGROUND[2]

### A.    Balk's Teaching Agreements with NYIT Bahrain

Balk is a white, non-Muslim, American citizen.[3]  In June 2006, pursuant to a one-year employment contract with NYIT ("First Teaching Agreement"), Balk took a computer graphics teaching post at NYIT's campus in Manama, Bahrain ("NYIT Bahrain").[4]  Contracted by NYIT, Infotec Corporation

---

[1]    Although the most recent Complaint in this case is the Third Amended Complaint (filed April 3, 2014), plaintiff's motion for summary judgment refers only to the Second Amended Complaint.  As the only difference between plaintiff's Second and Third Amended Complaints is the addition of claims against new defendant Mohamed Hussein – who is not party to the instant motions – I will consider the Third Amended Complaint ("Compl.") to be the operative Complaint for purposes of this Opinion.

[2]    The following facts are taken from plaintiff's Third Amended Complaint, Defendant NYIT's Rule 56.1 Statement ("NYIT 56.1"), Plaintiff's Response to Defendant's Rule 56.1 ("Balk 56.1 Resp."), Plaintiff's Rule 56.1 Statement ("Balk 56.1"), Defendant NYIT's Response to Balk's Rule 56.1 ("NYIT 56.1 Resp."), and supporting documents.

[3]    *See* Compl. ¶ 35.

[4]    *See* NYIT 56.1 ¶ 1;  Balk 56.1 ¶ 1.

("Infotec") provides operational support for NYIT Bahrain and other NYIT campuses across the Middle East, including with respect to campus facilities, recruitment, maintenance, and security services.[5]

Balk's First Teaching Agreement provided that his employment term at NYIT Bahrain would run from June 1, 2006 through May 31, 2007 and that his annual compensation would be $86,000.[6] On April 3, 2007, NYIT renewed Balk's teaching contract for another year ("Second Teaching Agreement"), pursuant to which he was to continue teaching at NYIT Bahrain from June 1, 2007 through May 31, 2008.[7] Sections 3 and 5 of the Second Teaching Agreement provided that Balk was to receive his annual compensation of $86,000 in monthly installments, and Section 8 provided that, as a consultant and not an NYIT employee, Balk "w[ould] not receive any NYIT employee benefits."[8] Additionally, Section 10(a) provided that: "[t]his consulting agreement may not be modified or amended except by a writing signed by both parties."[9] Section 10(b) provided that: "[t]his is

_____

[5]    *See* NYIT 56.1 ¶ 39.

[6]    *See id.* ¶¶ 1-2; *See also* 5/5/06 Consulting Agreement, Ex. A to 12/15/14 Affidavit of NYIT's Attorney, Samantha Beltre ("Beltre Aff.") ¶ 2.

[7]    *See* NYIT 56.1 ¶¶ 3-4;  4/7/07 Consulting Agreement, Ex. B to Beltre Aff. ¶ 2.

[8]    *See* 4/7/07 Consulting Agreement ¶¶ 3, 5, 8.

[9]    NYIT 56.1 ¶ 6;  4/7/07 Consulting Agreement ¶ 10(a).

the entire agreement of the parties on its [sic] subject, and there are no oral, collateral or other agreements, documents, or representations that are intended to be part of it or to construe it."[10] Balk received the entirety of the $86,000 compensation provided by the Second Teaching Agreement.[11]

Balk testified that in this position, he interacted with other administrators at NYIT Bahrain and Infotec, including: Dr. Edward Giuliano, NYIT President; Reginald Braggs, NYIT Dean of Students; Damon Revelas, NYIT Bahrain Campus Dean; Richard Pizer, Provost; Cyrus Reed, NYIT Vice President of Global Academic Programs; Roger Yu, Dean of the College of Arts and Sciences; Robert Michael Smith, Middle East Fine Arts Computer Graphics Coordinator; and Dr. Mohammed Hussein, NYIT Executive Chairman, Middle East and Infotec President.[12]

In addition, Balk testified that he had a "verbal" agreement with Dean Revelas, pursuant to which he would receive $150/hour for "overload" courses

---

[10]    NYIT 56.1 ¶ 7; 4/7/07 Consulting Agreement ¶ 10(b).

[11]    *See* NYIT 56.1 ¶ 5.

[12]    *See* 12/11/14 Affidavit of Dennis Balk ("Balk Aff."), Ex. 1 to 12/15/14 Affidavit of Balk's Attorney, Ridley M. Whitaker ("Whitaker Aff.") ¶ 6.

taught in excess of those required by the Second Teaching Agreement.[13]  Balk also testified that he had spoken with Dean Yu and Professor Smith about the possibility of renewing his teaching contract for a third term.[14]  He further testified that this third contract was to cover the two-year period between June 1, 2008 and May 31, 2010, and that its terms were to be "[s]ubstantially the same" as the Second Teaching Agreement.[15]  On March 11, 2008, while under the Second Teaching Agreement, Balk emailed Professor Smith stating that he was worried because: "NYIT can simply not renew my contract . . . [and] since I have no statement of promise for the contract, I have no concrete avenue for defense."[16]

## B.    Student Complaint Against Balk

On February 18, 2008, during the term of his Second Teaching Agreement, Balk spoke with five students in the NYIT Bahrain cafeteria, two of whom – Diyanah and Rahma Iskandrani (the "Iskandrani sisters") – were planning a trip to New York City.[17]  Balk has testified that during this conversation, he

---

[13]     *See* 6/25/12 Balk Deposition ("Balk Dep."), Ex. C to Beltre Aff., at 87-90.

[14]     *See id.* at 90-91.

[15]     *Id.* at 91.

[16]     3/11/08 Email from Balk to Smith, Ex. AM to Beltre Aff.

[17]     *See* NYIT 56.1 ¶ 41;  Balk Aff. ¶ 8.

"explained . . . that in a post-9/11 world in New York City that young Muslims should be prepared when they go to the West to understand why people might feel uncomfortable with them, because there are many preconceptions in New York City towards Muslims."[18]  He also testified that, as part of this same conversation, he "told the students that there were also gay Muslims in New York and some of them might also say that the Prophet Mohammad is gay."[19]

A few days later, around February 24, 2008, the Iskandrani sisters wrote to the NYIT administration, complaining that they had found Balk's remarks to be anti-Islamic and offensive (the "Student Complaint").[20]  Their Student Complaint included the following statements:[21]

• "We were surprised and shocked with the words that Professor Dennis Balk said as they were extremely rude, humiliating, disrespectful and full of clear racism."

• "He gave examples about democracy that insults our religious beliefs and as a professor he should realize that the words he said about our Prophet

---

[18]     Balk Aff. ¶ 13.

[19]     *Id.* ¶ 17.

[20]     *See* NYIT 56.1 ¶ 44;  Balk 56.1 ¶ 31.

[21]     *See* Balk 56.1 ¶ 31.

Mohammad peace be upon him are very sensitive and will never be a
definition of democracy."

- "He mentioned that a proof of democracy would be building a church next to
  our mosque and writing on the wall of it that our prophet is gay, and this is a
  ridiculous example."

### C.  Response to the Student Complaint

Balk testified that Dean Braggs informed him about the Student
Complaint on February 24, 2008 and asked that he write a response.[22]  In the wake
of the Student Complaint, Balk sent an email stating that school administrators
were "extremely concerned about the spread of these allegations, rumors,
particularly at th[e] critical time of [school] accreditation."[23]  On February 25,
2008, Balk read his letter response at a meeting with the Iskandrani sisters, Dean
Braggs, and other school administrators.[24]  After that meeting, Balk was asked by
the administration not to come to campus "at least tomorrow, as [Dean] Damon
[Revelas was] attempting damage control."[25]

---

[22]      *See* Balk Aff. ¶¶ 21-25.

[23]      2/25/08 Email from Balk to Yu and Smith ("2/25/08 Balk Email"),
Ex. I to Beltre Aff.

[24]      *See* Balk Aff. ¶ 26.

[25]      2/25/08 Balk Email.  *Accord* Balk Aff. ¶ 33.

Also on February 25, 2008, Dr. Hussein sent an email to Dr. Giuliano, explaining, among other things, that NYIT Bahrain was investigating a student complaint that Balk had made anti-Islamic comments but that "Balk has denied and stated that the students misunderstood."[26] Dr. Hussein's email further asserted that Balk "has been against Islam for quite a long time" and that "[a]ll this information is present in his website."[27] Due to the Student Complaint, Dr. Hussein's email cautioned:

> Students had [sic] started to complain outside the campus which means bad reputation for the University. . . . Now we have this problem and I've [sic] to stop him from coming to the campus before have more problems with the Ministry of Education, Students, Government and before this is printed in the media. This guy has to be removed immediately from the country before they put him in jail.[28]

On February 26, 2008, Dr. Giuliano replied to Dr. Hussein's email, copying other school administrators, stating: "I appreciate the seriousness of this issue . . . [and] I recognize that perception is reality and that we cannot afford this sort of negative perception."[29]

---

[26]     Balk 56.1 Resp. ¶ 47.

[27]     *Id.*

[28]     *Id.*

[29]     *Id.* ¶ 51.

In light of the controversy over the Student Complaint, Balk worried that "they are going to fire me, I need to think how I can make them responsible for a years salary"[30] and expressed "concern[] about [his] physical safety." [31]  Over the next several days, additional meetings were held among Balk, school administrators, and students.[32]  On February 28, 2008, Balk attended another meeting with school administrators and the Iskandrani sisters to "re-apologize" for his remarks.[33]

On March 1, 2008 and March 6, 2008, respectively, two articles appeared in Bahraini newspapers alleging that an unnamed professor at a private university had published a cartoon of the Prophet Mohammad on his personal website.[34]  On the evening of March 1, 2008, Balk was taken to the airport by an Infotec representative and left Bahrain for Jordan.[35]  On March 18, 2008, NYIT administrators informed Balk that he would not be able to return to NYIT

---

[30]    2/25/08 Email from Dennis Balk to Alit Balk, Ex. L to Beltre Aff., at DB01730.

[31]    2/26/08 Email from Balk to Smith, Ex. N to Beltre Aff., at DB01484.

[32]    *See* NYIT 56.1 ¶ 62.

[33]    *See* 2/28/08 Email from Balk to Smith, Ex. P to Beltre Aff.  *Accord* NYIT 56.1 ¶¶ 63, 65.

[34]    *See* NYIT 56.1 ¶¶ 71-73, 78-80.

[35]    *See* Balk Dep. at 44, 80, 138-139.  *Accord* NYIT 56.1 ¶ 76.

Bahrain.[36]

### D. NYIT's Decision Not to Renew Balk's Teaching Agreement

Around March 31, 2008, a meeting was held at NYIT's campus in Old Westbury, New York, at which Balk and other school administrators discussed options for retaining Balk as a member of the NYIT faculty.[37]  Over the next several weeks, NYIT explored whether Balk could teach at one of NYIT's campuses in China, Jordan, or New York.[38]  Provost Richard Pizer testified that NYIT was unable, however, to renew Balk's teaching contract for a third term because "there was no place for him to teach."[39]  Between 2005 and 2014, NYIT was unable to renew teaching agreements for eighteen of its Middle East faculty, four of whom were non-white and twelve of whom were citizens of countries other than the United States.[40]

## III. LEGAL STANDARD

---

[36]     *See* Balk Dep. at 172-174.

[37]     *See id.* at 177-181.

[38]     *See id.* at 179-180, 182-184;  4/7/08 Email from Reed to Balk, Ex. AI to Beltre Aff.

[39]     11/11/12 Deposition of Richard Pizer, Ex. E to Beltre Aff., at 274-275.

[40]     *See* Affidavit of NYIT Vice President, Human Resources Carol Jablonsky, Ex. BA to Beltre Aff. ¶ 5.

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[41] "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[42] "[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law[.]"[43] To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"[44] and "may not rely on conclusory allegations or unsubstantiated speculation."[45]

In deciding a motion for summary judgment, "[t]he role of the court is

---

[41]     *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[42]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotation marks and alterations omitted).

[43]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[44]     *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[45]     *Id.* (quotation marks and citations omitted).

not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[46] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[47]

"'[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases'"[48] given that "the salutary purposes of summary judgment – avoiding protected and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."[49] Thus, "even in the discrimination context[,] . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."[50] Greater caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue and circumstantial evidence

---

[46]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[47]     *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).

[48]     *Skalafuris v. City of New York Dep't of Corr.*, 437 Fed. App'x 54, 55 (2d Cir. 2011) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 456 (2d Cir. 2001)).

[49]     *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks and citation omitted).

[50]     *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014).

may reveal an inference of discrimination.[51]  Nonetheless, "[c]ourts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where . . . plaintiff has offered little or no evidence of discrimination."[52]

## IV.  APPLICABLE LAW

### A.  Title VII Discrimination

#### 1.  Generally

Title VII prohibits an employer from discriminating against or terminating an individual on the basis of "race, color, religion, sex, or national origin."[53]  "To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [analysis] laid out by *McDonnell Douglas Corp. v. Green*."[54]

Under the *McDonnell Douglas* framework, an employee initially bears the burden of producing evidence sufficient to support a prima facie case of

---

[51]     *See Gorzynski v. JetBlue Airways*, 596 F.3d 93, 101 (2d Cir. 2010).

[52]     *Galimore v. City Univ. of New York Bronx Community College*, 641 F. Supp. 2d 269, 280 (S.D.N.Y. 2009) (quotation marks and citation omitted) (alteration in original).

[53]     42 U.S.C. § 2000e-2.

[54]     *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

discrimination.[55]  To do so, a plaintiff must show:  "(1) he is a member of a protected class;  (2) he was qualified for the position he held;  (3) he suffered an adverse employment action;  and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination" based on his membership in the protected class.[56]  However, such evidence need be no more than "minimal" or "de minimis."[57]  An adverse employment action is an action by which a plaintiff "has suffered 'a materially adverse change in his employment status' or in the terms and conditions of his employment."[58]  Examples of adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities."[59]

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for

---

[55]    *See McDonnell Douglas*, 411 U.S. at 802.  *See also Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

[56]    *Ruiz*, 609 F.3d at 492.

[57]    *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

[58]    *Kessler v. Westchester Cnty. Dep't of Soc. Serv's*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Williams v. R.H. Donnelley*, *Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).

[59]    *Id.* (quotation marks and citation omitted).

the adverse employment action.[60]  To do so, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for" its actions.[61]

Finally, if the employer articulates a nondiscriminatory reason for the challenged action, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation was pretextual and/or that discrimination was a motivating factor.[62]  "Plaintiff bears the burden of proving not just pretext, but . . . discrimination . . . and thus the burden of pointing the court to the existence of evidence that would raise a disputed issue of material fact on this score."[63]

Notably, in order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence;  it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to

---

[60]     *See Ruiz*, 609 F.3d at 492.

[61]     *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

[62]     *See Ruiz*, 609 F.3d at 493 ("A plaintiff can rebut the employer's proffered legitimate, nondiscriminatory reason by proving that discrimination played a role in the employer's decision[.]").  *See also Patterson v. County of Oneida, New York*, 375 F.3d 206, 221 (2d Cir. 2004).

[63]     *Perez v. New York State Office of Temp. & Disability Assistance*, No. 14 Civ. 1621, 2015 WL 3999311, at *4 (S.D.N.Y. June 30, 2015) (quotation marks and citation omitted).

disguise discrimination.[64]  A plaintiff is required to do "more than cite to [his] mistreatment and ask the court to conclude that it must have been related to [his] race."[65]  However, "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination."[66]  Therefore, the plaintiff can survive summary judgment if he produces facts sufficient to permit a reasonable fact-finder to disbelieve the defendant's explanation in favor of the plaintiff's explanation that discrimination occurred.

### 2.    Hostile Work Environment Claim

A hostile work environment claim under Title VII requires a showing that:  (1) "that the discriminatory harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" and (2) "'that a specific basis exists for imputing' the objectionable

---

[64]    *See id.* (citation omitted).  *See also Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *2 (2d Cir. Sept. 7, 2011).

[65]    *Perez*, 2015 WL 3999311, at *4 (citing *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)).

[66]    *Id.* (citation omitted).  *Accord Reeves v. Sanderson Plumbing Prod's*, 530 U.S. 133, 134 (2000).

conduct to the employer."[67]  "[T]he plaintiff also must show that the hostile conduct occurred because of a protected characteristic."[68]

### 3.    Joint Employer Doctrine

"It is axiomatic that, in order to be liable for employment discrimination under Title VII, an entity must have been the complainant's employer."[69]  "Where 'an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity,' the latter entity may be liable to the employee as her joint employer."[70]  The "joint employer doctrine applies when separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly."[71]  In evaluating whether entities constitute joint employers, courts "look at 'commonality of hiring, firing,

---

[67]     *Tolbert*, 790 F.3d at 438-39 (quoting *Alfani v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).

[68]     *Id.* at 439 (citation omitted).

[69]     *Conde v. Sisley Cosmetics USA*, No. 11 Civ. 4010, 2012 WL 1883508, at *2 (S.D.N.Y. May 23, 2012).

[70]     *Id.* at *3 (quoting *Arculeo v. On-Side Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)).

[71]     *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (quotation marks and citation omitted).

discipline, pay, insurance, records, and supervision.'"[72]

## B. Breach of Contract

### 1. Generally

Under New York law, a breach of contract claim requires: "(1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach."[73] A breach of contract claim "that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal."[74] Thus, the plaintiff must plead facts showing that an enforceable contract existed, including facts surrounding the formation of the contract, such as the contract's date, major terms, names of the parties, and that the party to be bound actually assented to the contract.[75] In addition, "[f]ailure to demonstrate [] non-speculative damages will result in summary judgment in favor

---

[72]    *Id.* (quoting *N.L.R.B. v. Solid Waste Serv's*, 38 F.3d 93, 94 (2d Cir. 1994)).

[73]    *MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, Nos. 14 Civ. 7091, 14 Civ. 7973, 2015 WL 221055, at *3 (S.D.N.Y. Jan. 15, 2015) (citing *Diesel Props S.r.l. v. Grey Stone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)).

[74]    *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (quotation marks and citation omitted).

[75]    *See id.*

of the defendant."[76]  Further, "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally . . . cannot be changed by an executory agreement unless [that] executory agreement is in writing and signed by the party against whom enforcement . . . is sought."[77]

## 2.    Preliminary Agreements

"[O]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract."[78]  As such, it is generally in two rare situations that courts have recognized certain preliminary agreements as creating binding obligations rather than mere unenforceable agreements to agree.[79]  The first is a "fully binding preliminary agreement[], which [is] created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document."[80]  "Accordingly, a party may demand

---

[76]    *Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 980 F. Supp. 2d 400, 414 (E.D.N.Y. 2013) (citing *Upper Deck Co. v. Breakey Int'l*, 390 F. Supp. 2d 355, 362 (S.D.N.Y. 2005)).

[77]    *Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289, 297 (S.D.N.Y. 2011) (citing N.Y. GOL § 15-301).

[78]    *Vacold LLC v. Cerami*, 545 F.3d 114, 123-24 (2d Cir. 2008) (citing *Adjustrite Sys's, Inc. v. GAB Business Serv's*, 145 F.3d 543, 548 (2d Cir. 1998)).

[79]    *See id.* at 124.

[80]    *Id.* (citation omitted).

performance of the transaction even though the parties fail to produce the more elaborate formalization of the agreement."[81]  In evaluating whether a fully binding preliminary agreement has been created, courts consider:  "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing;  (2) whether there has been partial performance of the contract;  (3) whether all of the terms of the alleged contract have been agreed upon;  and (4) whether the agreement at issue is the type of contract that is usually committed to writing."[82]  "[T]here is a strong presumption against finding binding obligation[s] in an agreement that include[s] open terms . . . and explicitly anticipate[s] future preparation and execution of contract documents."[83]

The second type, which has been called a "binding preliminary commitment," may be formed where "the parties agree on certain major terms, but leave other terms open for further negotiation."[84]  Under these circumstances, the parties are bound only to the obligation to negotiate the open issues in good faith in

---

[81]  *All R's Consulting v. Pilgrims Pride Corp.*, No. 06 Civ. 3601, 2008 WL 852013, at *10 (S.D.N.Y. Mar. 28, 2008) (citing *Adjustrite*, 145 F.3d at 548)).

[82]  *CAC Grp. v. Maxim Grp.*, 523 Fed. App'x 802, 803-04 (2d Cir. 2013) (citation omitted).

[83]  *Vacold*, 545 F.3d at 128 (quotation marks and citation omitted) (alterations in original).

[84]  *Id.* at 124 (quotation marks and citation omitted).

an attempt to reach the . . . objective within the agreed framework"; if they "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation" and no right to demand performance.[85]  In determining whether either type of preliminary agreement exists, the "ultimate" factor is "the intent of the parties:  whether the parties intended to be bound, and if so, to what extent."[86] "To discern that intent a court must look to the words and deeds [of the parties,] which constitute objective signs in a given set of circumstances."[87]

### C.    Conspiracy to Commit Fraud

Because New York does not recognize an independent tort of conspiracy, liability for conspiracy requires the establishment of the independent underlying tort.[88]  Under New York law, the elements of a fraud claim are:  "(1) misrepresentation or omission of a material fact; (2) made deliberately or knowingly . . . ;  (3) with the intent to defraud;  (4) reasonable reliance on the representation; and (5) pecuniary damages or loss."[89]  "[A]t all stages, including at

---

[85]      *Id.*

[86]      *Id.* at 125.

[87]      *Adjustrite*, 145 F.3d at 548-49 (quotation marks and citations omitted) (alteration in original).

[88]      *See Stokes v. Lusker*, 425 Fed. App'x 18, 22 (2d Cir. 2011).

[89]      *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 560-61 (E.D.N.Y. 2010) (citing *Herzfeld v. JPMorgan Chase Bank*, 354 Fed. App'x 488, 489 (2d Cir.

summary judgment," a plaintiff is required to prove "each element . . . by clear and convincing evidence."[90]

## V. DISCUSSION

### A. First, Second, and Third Claims: Title VII Claims Against NYIT

Balk's First, Second, and Third Claims allege that NYIT discriminated against him on the basis of race, religion, and national origin, respectively. Because the standard and relevant facts for evaluating each of these claims is identical, I will address them together.

#### 1. Balk Cannot Establish a Prima Facie Case of Discrimination

Balk argues that NYIT's handling of the newspaper articles, decision to remove him from NYIT Bahrain, and failure to renew his teaching contract for a third term constituted unlawful discrimination against him because these actions were based on his status as a "a white, non-Muslim . . . American citizen."[91] Balk's speculative and conclusory allegations of discrimination are inadequate, however, to establish a prima facie case of discrimination under Title VII, which requires that a plaintiff show, *inter alia*, that he suffered an adverse employment

<hr/>

2009)).

[90]     *Id.* (citation omitted).

[91]     Compl. ¶ 35.

action that "took place under circumstances giving rise to [an] inference of discrimination" due to his membership in a protected class.[92]  Balk cannot raise an inference of discrimination merely by presenting evidence that he was treated badly or unfairly.  Rather, he must demonstrate – which he fails to do – that the alleged discriminatory treatment against him was based on a protected characteristic.

Balk points to three categories of purported discrimination, none of which support an inference of discrimination against him.  *First*, Balk alleges that NYIT "creat[ed] a hostile work environment through the publication of . . . defamatory articles in the Bahraini news."[93]  This argument fails, as Balk has presented no evidence that any of the articles – all published by independent news sources and none of which identify Balk – were drafted, published, or republished by NYIT.[94]  At times, Balk also suggests that NYIT should be liable for not defending him against the newspaper allegations and other criticism he endured.[95]

---

[92]     *Ruiz*, 609 F.3d at 492.

[93]     Compl. ¶ 61.  *Accord id.* ¶¶ 64, 68.

[94]     In fact, at least one of the articles was published only after Balk had left Bahrain, and thus could not have influenced his "work environment."

[95]     *See, e.g.*, Plaintiff's Memorandum of Law in Support of His Motion for Summary Judgment ("Balk Mem.") at 9.

Title VII does not, however, require employers to protect their employees from public backlash – even unfounded backlash. It simply prohibits employers from making employment decisions for discriminatory reasons. Likewise, Balk provides no evidentiary support for his claim that NYIT's response to the Student Complaint, newspaper articles, or campus attitudes about him was motivated by discriminatory animus.[96] He simply draws upon his perceived mistreatment by NYIT to conclude that NYIT's strategy was driven by discrimination.

*Second*, Balk alleges that NYIT's decisions to remove him from NYIT Bahrain and escort him out of the country had discriminatory motivations. As Balk puts it, "in summarily casting out Balk, based upon its belief that NYIT Bahrain students and others would not accept that Balk had done nothing wrong (because he was non-Muslim and American) . . . . [,] NYIT's actions and inaction constitute actionable discrimination."[97] He also suggests that NYIT discriminated against plaintiff "to avoid a negative backlash from its Muslim customer base in

---

[96] Balk also suggests that NYIT acted in a discriminatory manner in failing to inform him of Dr. Hussein's February 25, 2008 email. However, there is no evidentiary support for the claim that NYIT's decision-making with respect to Dr. Hussein's email was related to any of Balk's protected characteristics.

[97] Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 3.

Bahrain."[98]  Balk has not, however, presented any evidence supporting his claim that NYIT's actions were based on his protected characteristics.  In fact, he admits to speaking with a group of students on February 18, 2008 about certain differences between Western and Islamic culture – a conversation that offended some students and resulted in negative publicity for himself and NYIT (and in response to which NYIT removed him from NYIT Bahrain).  Balk's theory that NYIT bowed to public pressure in order to placate its students has nothing to do with discriminatory animus and Balk has offered nothing suggesting that NYIT would have treated a non-white, Muslim, and/or non-American citizen creating a similar controversy any differently.

*Third*, Balk claims that NYIT's failure to renew his teaching agreement, and the circumstances surrounding that decision, give rise to an inference of discrimination.   These allegations are insufficient to demonstrate discriminatory animus on the part of NYIT as Balk fails to present any evidence that its decision not to renew his contract was related to his race, religion, or national origin.  Again, he simply points to the fact that his contract was not renewed as proof that he was discriminated against.

### 2. NYIT's Legitimate, Non-Discriminatory Reasons for Its Decisions

---

[98]      *Id.* at 24 n.44.

Even if Balk had established a prima facie case of discrimination, NYIT has proffered legitimate, non-discriminatory reasons for its actions: that its response to the Student Complaint and ensuing publicity, removal of Balk from NYIT Bahrain, and decision not to renew Balk's teaching agreement were business decisions made to protect Balk and the school.

Upon receiving the Student Complaint, NYIT immediately launched an internal investigation and attempted to mediate the situation between Balk and its students. NYIT explains that, faced with continued uproar about Balk's alleged anti-Islamic sentiments, it ultimately found it prudent to discharge Balk from his teaching duties and facilitate his exit from Bahrain. In fact, Balk's moving papers – which quote Dr. Giuliano's February 26, 2008 email that "perception is reality and we cannot afford this sort of negative perception"[99] – support the inference that NYIT's decision regarding Balk's continued presence at NYIT Bahrain was based on the school's business concerns. Whether the allegation that Balk was anti-Islamic was true is irrelevant to the Title VII inquiry about NYIT's decision to remove Balk from NYIT Bahrain – what is relevant is NYIT's good-faith belief that its students and the public were offended.

In addition, NYIT explains that it did not renew Balk's teaching

---

[99]    Plaintiff's Memorandum of Law in Reply and in Further Support of His Motion for Summary Judgment at 2.

agreement because, having determined that it was unwise and unsafe for him to continue at NYIT Bahrain, there were no suitable positions open for him at any of its campuses – an explanation that is entirely unrelated to Balk's status as a white, non-Muslim, American citizen.  NYIT offers evidence that, before reaching the decision not to renew Balk's contract, it attempted to relocate him to another NYIT campus – including by exploring options in New York, China, and Jordan.  NYIT also asserts that Balk was not singled out during the renewal process but that it was unable to renew contracts for eighteen of its Middle East faculty members between 2005 and 2014, including four individuals who were non-white and twelve individuals who were not United States citizens.  Because NYIT provides legitimate business reasons for its actions, the burden shifts back to Balk to show that these proffered reasons are pretextual and that these actions were, in fact, motivated by unlawful discrimination.

### 3.    Balk Has Offered No Evidence of Pretext

Balk attempts to argue that NYIT's stated reasons for its actions were pretext for intentional discrimination, but he does not point to any evidence to support this position.  Instead, he concludes that NYIT's proffered reasons were pretextual and asks the Court to do the same.  Accordingly, because Balk fails to satisfy his burden of establishing Title VII liability, his First, Second, and Third

Claims against NYIT are dismissed.

## B.     Fourth Claim:  Breach of Contract

Balk also argues that NYIT breached three contracts with him:  (1) the Second Teaching Agreement;  (2) a verbal agreement to compensate him for "overload" courses taught in addition to those required by the Second Teaching Agreement;  and (3) another verbal two-year teaching agreement that was to commence on June 1, 2008 (the "Alleged Third Teaching Agreement").[100]  His breach of contract claim must be dismissed, however, as NYIT fully performed the Second Teaching Agreement – the only valid contract of the three under which Balk seeks recovery.

### 1.     NYIT Did Not Breach the Second Teaching Agreement

Balk offers a number of unsuccessful arguments in support of his claim that NYIT breached the Second Teaching Agreement.[101]  *First*, Balk claims that NYIT prematurely terminated the Second Teaching Agreement – but this agreement expired according to its own terms on May 31, 2008, pursuant to which Balk received his entire annual compensation of $86,000 (despite not teaching any courses after February 2008).  Thus, Balk has no claim for breach of the Second

---

[100]     *See* Compl. ¶¶ 72-81.

[101]     *See id.* ¶ 77.

Teaching Agreement as it was not terminated prior to its scheduled end-date and he was fully compensated under it.

Nevertheless, Balk also claims that NYIT somehow violated Sections 3 and 5 of the Second Teaching Agreement by preventing him from being compensated for "overload" courses. But neither Section 3 nor Section 5 – let alone any other section of the Second Teaching Agreement – addresses overload courses or payments. He further contends that NYIT violated Section 8 of the Second Teaching Agreement by failing to provide him with NYIT employee benefits.[102] Section 8 clearly states, however, that Balk "*will not* receive any NYIT employee benefits."[103] As NYIT was under no obligation to provide Balk with NYIT employee benefits, it cannot be liable for not doing so.[104]

## 2. Any Verbal Overload Agreement Is Unenforceable

Balk also suggests that NYIT breached a separate verbal agreement, pursuant to which he was to receive $150/hour for any "overload" courses taught

---

[102]  *See* 4/7/07 Consulting Agreement ¶¶ 3, 5.

[103]  *See id.* ¶ 8 (emphasis added).

[104]  Balk offers several additional arguments in support of his claim that NYIT breached the Second Teaching Agreement, none of which have any basis in that agreement and all of which are without merit.

in excess of those required by the Second Teaching Agreement.[105]  Because

Subsections 10(a) and 10(b) of the Second Teaching Agreement prohibit oral

modifications and collateral agreements to that contract, any such verbal agreement

about overload courses – even if one had been made – would be unenforceable.[106]

### 3. The Alleged Third Teaching Agreement Did Not Create Any Contractual Obligations

Furthermore, Balk claims that NYIT breached an Alleged Third

Teaching Agreement, which he describes as a two-year teaching contract that was

to commence on June 1, 2008 and contain "[s]ubstantially the same" terms as the

Second Teaching Agreement.[107]  It is undisputed that this Alleged Third Teaching

Agreement was never reduced to a signed writing.  Nevertheless, Balk seeks to

hold NYIT liable for not formalizing this Alleged Third Teaching Agreement,

which he argues was created through the conversations he had on the subject with

Dean Revelas and Professor Smith.

Because the evidence demonstrates, however, that the parties did not

intend to be bound by these conversations, at most, they gave rise to an

unenforceable agreement to agree between NYIT and Balk.  In fact, Balk's own

---

[105]    *See, e.g.*, Balk 56.1 Resp. ¶¶ 155-156.

[106]    *See* 4/7/07 Consulting Agreement ¶¶ 10(a)-(b).

[107]    Balk Dep. at 91.  *Accord* Compl. ¶ 79;  Balk Mem. at 26-27.

March 11, 2008 email to Professor Smith reveals his understanding that any conversations he had regarding the Alleged Third Teaching Agreement were speculative and non-binding on NYIT.  Further, Balk was well aware that NYIT routinely requires written teaching agreements, having signed two such agreements in previous years.  In addition, Balk's description of the Alleged Third Teaching Agreement is cursory and lacks material terms such as salary, job responsibilities, and benefits, providing further indication that the parties anticipated future approvals and documentation before any contractual obligations would be formed.

    **C.**    **Sixth, Seventh, and Eighth Claims:  Title VII Claims Against NYIT as a Joint Employer with Infotec**

Balk also argues that employees of Infotec discriminated against him based on his protected characteristics and that NYIT should be liable for Infotec's allegedly discriminatory acts because it served as a "joint employer" with Infotec. Balk's Title VII claims against Infotec are identical to his Title VII claims against NYIT.  For the reasons stated above, Balk has produced no evidence of discrimination.  Without a basis for imposing liability, NYIT cannot be held liable for the conduct of Infotec employees.  In any event, because NYIT and Infotec were parties to an arm's length contract under which Infotec provided certain services to NYIT, NYIT lacked the requisite knowledge and control over Infotec to be held liable for Infotec employees' actions. Accordingly, as asserted against

NYIT, Balk's Sixth, Seventh, and Eighth Claims to hold NYIT liable for the acts of Infotec are dismissed.

### D. Ninth Claim: Conspiracy to Commit Fraud

Balk's final claim against NYIT is that it conspired with Infotec to "defraud [him] into leaving [NYIT Bahrain] on February 25, 2008, pursuant to Dr. Hussein's decision on February 25, 2008[] to intentionally ban [him] from the Bahrain campus."[108]  To bolster this theory, Balk argues that NYIT's fraudulent representations included its failure to inform him of Dr. Hussein's February 25, 2008 email, in which Dr. Hussein alleges that Balk had anti-Islamic content on his website and advises that Balk be removed from NYIT Bahrain.  Balk also claims that the February 28, 2008 meeting with the Iskandrani sisters was "a ruse and part of a fraudulent scheme . . . when NYIT and Infotec had already made the decision to remove [him] from Bahrain."[109]

However, Balk presents no evidence – let alone clear and convincing evidence – that NYIT acted with the intent to defraud him.  Instead, he points to the series of events that culminated in his removal from NYIT Bahrain and asks the Court to infer that these events were connected by a fraudulent scheme.  For

---

[108]     Compl. ¶ 105.

[109]     *Id.*

example, Balk's argument that he was not informed of Dr. Hussein's February 25, 2008 email does not establish that NYIT defrauded him in neglecting to mention it. In fact, there is no evidence that NYIT's decision to remove Balk from NYIT Bahrain was based on Dr. Hussein's February 25, 2008 email or made prior to the February 28, 2008 meeting with the Iskandrani sisters. Nor is there any evidence that the February 28, 2008 meeting was a "ruse" rather than part of NYIT's efforts to defuse the situation between Balk and the Iskandrani sisters. In sum, beyond his own speculation, Balk offers nothing to support his claim that NYIT conspired to defraud him. As such, Balk's Ninth Claim against NYIT is also dismissed.

## VI.    CONCLUSION

For the foregoing reasons, defendant NYIT's motion for summary judgment is GRANTED in full and plaintiff's motion for summary judgment is DENIED in full. Plaintiff's First, Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Claims are dismissed against NYIT, and NYIT is dismissed from this case. Plaintiff's Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Claims survive to the extent that they are asserted against other defendants. The Clerk of the Court is directed to close these motions (Docket Nos. 172 and 180).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
            September 16, 2015

**-Appearances-**

**For Plaintiff:**

Randy M. Kornfeld, Esq.
Kornfeld & Associates P.C.
250 Madison Avenue, 8th Floor
New York, NY 10016
(212) 759-6767

Ridley M. Whitaker, Esq.
Law Offices of Ridley M. Whitaker
830 Third Avenue, 5th Floor
New York, NY 10022
(212) 218-5656

Vincent E. Bauer, Esq.
Law Offices of Vincent E. Bauer
112 Madison Avenue, 5th Floor
New York, NY 10016
(212) 575-1517

**For Defendant NYIT:**

Douglas Peter Catalano, Esq.
Neil G. Sparber, Esq.
Samantha E. Beltre, Esq.
David Jason Kessler, Esq.
Norton Rose Fulbright US LLP
666 5th Avenue
New York, NY 10103
(212) 318-4000